THE MEMPHIS ST. RY. CO. v. W. A. AYCOCK.

Western Section. November 1, 1929.

Petition for Certiorari denied by Supreme Court, April 5, 1930.

Wilson, Gates & Armstrong, of Memphis, for plaintiff in error.
Holmes, Canale, Loch & Glankler, of Memphis, for defendant in error.

HEISKELL, J. This is a suit by W. A. Aycock against the Memphis Street Railway Company for damages on account of personal injuries received in a collision accident. There was a verdict in favor of plaintiff for $7000 which was reduced on the suggestion of the court to $6000 and the defendant appealed.

The plaintiff's version is:

On the morning of the casualty Mr. Aycock, driving a milk truck which was on a Ford chassis, was proceeding eastwardly on Lamar Boulevard. He made a stop at Bellevue and passed the street car also going east, about half way between Bellevue and Central avenue. At that time the operator of the street car was seated writing on his trip sheet, and had advanced the controller to about the half way point on the control box. The street car was a one man car and Mr. McMillan, the operator, was an extra man.

As Mr. Aycock, who had been an employee of the Street Railway Company for eight or nine years, passed the car, the operator waved at him.

Just as Mr. Aycock got to the first sub-way, which was about a half mile east of where he had passed the street car, he looked back and saw the street-car at least two hundred yards or more behind him, and the operator still writing on his trip sheet.

About half way between the first and second subway Mr. Aycock again looked back and did not see the car at all. This was about half a mile west of the subway. At that time he was driving about twenty miles an hour, and when he got about even with the end of the neutral strip he slowed to eight miles an hour to keep from breaking milk bottles, because of holes in the street. He was driving on the south or right side of the street and never did get on the street car tracks. He heard no gong or warning sound.

Just as Mr. Aycock got under the subway with the front end of his truck, he was struck from the rear by the street car and his truck driven into the middle pillar supporting the viaduct.

The car did not stop but kept on going to the top of the hill at McLemore avenue, a distance of two hundred and thirty feet.

In other words, from the time that he left the end of the neutral strip until he was struck, Mr. Aycock traveled more than eighty-six feet at the rate of eight miles per hour.

The street car was equipped with an emergency control which worked automatically when the motorman took his foot off of a pedal on the front platform and his hands off of the controller, and could be stopped within fifteen feet running at twenty-five miles an hour; within twenty to twenty-five feet at thirty-five miles per hour, and within four or five feet at fifteen miles an hour.

Mr. Aycock's truck was not equipped with a rear view mirror. It had a cab in front, in the rear of which was a glass panel as shown by the photograph on page 46 of the transcript. When loaded exactly as the truck was loaded on the day of the casualty, there was at least a ten inch space in height above the load through which Mr. Aycock could have looked.

He admitted frankly that he would not look back through the panel but would lean out of the left side of the cab, and sometimes put his left foot on the running board and lean out in looking backward.

He admitted he did not look back within a half mile of the subway in which the accident occurred.

The truck was six feet, eight inches wide and the overhang of the street car between the rail and the side of the car was eighteen to twenty-four inches.

Mr. Aycock's testimony that he was struck from behind and shoved into the second post, is corroborated by Mr. Hasty and by Mr. Tull. Mr. Hasty also corroborates Mr. Aycock on the fact that no gong or warning was sounded.

The motorman, McMillan, is the only eye-witness for defendant. He stated that he passed the plaintiff about fifty or one hundred yards from the subway, and was slightly in front of him, and that when he got to the subway the plaintiff attempted to go into the subway at the same time the street car did, and that the shoulder

of his street car struck the left front corner of the truck and jammed it into the middle post. The shoulder of the street car is explained as being the projection just back of the door.

There is no assignment of error that there is no evidence to suport the verdict and besides it seems clear that the plaintiff's theory of the accident is the more reasonable. It is corroborated by other witnesses and by the physical facts and circumstances. It is not necessary therefore to consider anything outside the plaintiff's version as to how the accident occurred.

Assignments of error 1, 4 and 5 can best be considered together. Number one is as follows:

"The court erred in refusing to grant the defendant's mo‹ tion for a peremptory instruction at the close of all the evidence. This assignment is based upon the failure of the plaintiff to have a rear view mirror on his truck, in violation of the Statute of the State of Tennessee, as set forth in chapter 53 of the Acts of 1923."

and Number four is:

"The court erred in charging the jury as follows:

" 'Now, gentlemen, I have given you these city ordinances and now there is a State statute on the subject of mirrors on vehicles and trucks used upon the streets of the City of Memphis, which I will read to you and give you in charge. This is an Act passed by the Legislature of our State and was in effect at the time of this accident. It provides that any motor truck upon the streets, roads, highways and other public thoroughfares of Tennessee which by reason of their construction shall, either when loaded or unloaded, prevent the driver's view of the rear, shall be equipped with a mirror arranged in such manner and maintained so that the driver or operator may view the roadway to the rear and note the approach of vehicles from the rear of such motor truck, and a second section of this Act makes it a misdemeanor not to comply with this law.

" 'Now, gentlemen, the construction of this Statute which I think is the proper one, is if this motor truck, the subject of this investigation, was provided with a window in the rear, if you so find, and that through this window a person could see in the rear, there was no necessity then under this law I take it for a mirror, but if it was so loaded that it was impossible to see in the rear, then there was a necessity for the mirror, and it was the duty of the driver of this car to use this mirror in order to ascertain the condition of things behind him, the movement of vehicles, persons or anything else, and whether this was done or not in this case is a question for you to determine. It is in proof here without any controversy

that this car was not equipped with any mirror. Now, if you find that the driver of this car could not look out to the rear and see what was going on in the rear of him without this mirror, it ought to have been there and ought to have been used by the driver of the car in order to ascertain the condition in the rear, but if it was loaded so that a person could look out and get a view of the rear without the mirror I think the reasonable construction of this Act is that the mirror under those circumstances would not have been necessary, and it is a question for you to determine in this case what these facts are.'

"As the court likewise committed the same error in another portion of its charge, and as the issue is the same, we will group these two errors together. The court erred, therefore, in charging the jury as follow:

" 'Now, if the mirror was not on the car, but if the accident would have happened whether the mirror was there or not, and the proximate cause of the accident had nothing to do with the presence or absence of the mirror, then necessarily that would have no effect upon the result of your verdict, but if the mirror under the circumstances, as the car was loaded, was necessary, as I charged you, and was not used and ought to have been used, and there was no way to look out except through this mirror the way the car was loaded, then it was the duty of the driver of the truck and the owner of the truck to comply with this law; and the failure to do so would be negligence, but it would not be sufficient to bar recovery, unless you find that the negligence in not having a mirror was the proximate cause of the injury, or contributed actively and efficiently as I have heretofore charged you, to cause the injury in which event there could be no recovery upon the part of the plaintiff, and your verdict should be for the defendant. Now all these things are questions for you to determine from all the facts and circumstances of the case, bearing in mind the charge that I have given you and the rules of law laid down for your guidance.'

"Briefly summarized the undisputed facts in this case show that the truck which the plaintiff was driving, could be and frequently was so loaded that the driver could not have a view to the rear.

"The plaintiff in a former trial testified that he could not see to the rear on account of the way the truck was loaded.

"Also the plaintiff testified that he never used the glass in the rear of the cab of the truck, but undertook to look to the rear by stepping down on the running board of the cab, or leaning out of the cab. In short, the testimony showed that the truck was frequently loaded so as to prevent the rear view,

and that the plaintiff knew this fact, and never looked back through the glass. The necessity and need of the rear view mirror is absolutely shown by the plaintiff's own proof.

"Chapter 53 of the Acts of 1923 of the Tennessee Legislature provides that trucks using the highways 'which by reason of their construction, either when loaded or unloaded, prevent the driver's view of the rear, shall be equipped with a mirror arranged in such a manner, and maintained so that the driver or operator may view the roadway to the rear, and note the approach of vehicles from the rear of such motor trucks.'

"The court clearly erred in the foregoing charge to the jury in submitting to them the question of whether or not at the time of the accident the plaintiff could see through the rear of his truck. By virtue of the, construction of the truck the foregoing statute required that there be a rear view mirror on this truck, and under the admitted testimony, the plaintiff violated this Statute.

"The defendant's theory of the proper construction of this Act is set forth in a special instruction, which the court refused to give, and which is set forth in the assignment next following.

"This Act has never been construed, nor are there any authorities construing a similar act. Counsel and the court will have to rely solely on their analysis of the Act itself."

Number 5 consists merely of requested instructions to the jury which the court refused and this is assigned as error. These requests ask the court to charge according to the argument embodied in Assignment Number 4. If the charge of the court attacked in assignment four was not erroneous, then of course it was not error to refuse the peremptory instruction referred to in assignment 1 and it was not error to refuse to charge as asked according to assignment five.

The statute provides that the rearward mirror must be used when the construction of the truck when loaded or unloaded prevents the driver's view to the rear. This has nothing to do with the driver's use of the means of seeing behind his truck. His view may be unobstructed yet he may be negligent by reason of not looking back. Or he may have a mirror properly placed and may be negligent for not observing what it reflected. The point of the statute is that he must have the means of seeing behind the truck, either by direct or reflected vision. If the means of direct vision exists, then he does not need the mirror. The proof is that the cab of the truck had a glass at the back through which the driver could look when the truck was loaded as it was the morning of the accident. This being so, a mirror was not required. A

truck at one time might require a mirror and not at another time. An open truck without a top or cab might be used for a large part of the year for hauling bricks and pig iron, or similar heavy material, never rising high enough to obstruct the rearward view. Manifestly no mirror would be required. But if the same truck during the cotton season was used for hauling bales of cotton, then the statute would require a mirror. We see nothing wrong in the construction given to the statute by the trial court.

The court also charged the jury that even if a mirror was required and not on the truck, that this would not bar a recovery unless it was the proximate cause of the accident. There was no error in this and therefore all these assignments are overruled.

The second assignment is that the court erred in refusing to grant defendant a new trial upon the ground of the newly discovered evidence of Dr. J. S. Speed, a physician who treated the plaintiff.

It was disclosed in the testimony of the plaintiff during the first day of the trial that Dr. Speed had treated him at one time and that he did not expect to call Dr. Speed as a witness. After defendant rested in the afternoon of the first day of the trial, defendant asked to have the case go over until the next day in order to produce Dr. Speed. There was no showing then as to what Dr. Speed would say. This application was denied and defendant did not except. The argument proceeded but was not concluded and court adjourned until 10 o'clock next morning. No further application was made. Dr. Speed was not produced. There was no showing as to what his testimony would be if produced and no application to take his deposition, and no subpoena was issued for him. There was no application at any time by defendant to have a physical examination of the plaintiff. The first day of the trial was March 31st. Dr. Clifton's deposition was taken on March 19th, and he testified that plaintiff had been examined at Dr. Willis Campbell's Clinic. He does not mention Dr. Speed but it was at Dr. Campbell's Clinic that Dr. Speed treated plaintiff. So that defendant knew several days before the trial that plaintiff had been treated at the Clinic and could have ascertained about Dr. Speed. Besides all this, Dr. Speed examined plaintiff in September, 1928, and Dr. Clifton testified as to his condition in March, 1929.

The third assignment is:

"The court erred in submitting to the jury the question of remote and proximate contributory negligence, in that the court did not in any place define or state to the jury the difference between remote and proximate negligence. The court's instruction in the charge in this respect was insufficient."

This assignment is not followed up in argument, but passing this, if a more specific charge was desired, it should have been requested. The court said this to the jury:

> "But if you should find that while the defendant was negligent yet the negligence of the plaintiff cooperated actively and contributed to cause the injury, there could be no recovery upon the part of the plaintiff, and your verdict should be under those circumstances for the defendant."

We do not think the result would have been changed by a more specific charge defining the difference between proximate and remote contributory negligence.

In Assignments 6 and 7 complaint is made of the charge as to the effect of plaintiff Aycock's testimony at a trial of a suit growing out of this same accident brought by the milk company to recover for damage to the truck.

On that trial Mr. Aycock said he could not see to the rear because his truck was so loaded that the boxes of milk obstructed his view out of the rear window.

In the instant case he testified that there was a ten inch space in the window through which he could have seen had he looked, and says that he was mistaken in his testimony on the former trial, stating that at the suggestion of his counsel he loaded the truck exactly as it had been loaded on the day of the accident with the same number of cases, and found that the boxes did not cover up the rear window in the cab.

Mr. Tull testified that the truck was loaded in the usual and customary way with the same number of crates as were called for by the loading sheet on the day of the accident.

A photograph is presented of the truck as loaded for the test, which corroborates the plaintiff and Tull as to the truck as then loaded.

The court charged the jury so far as need be noticed in this connection, as follows:

> "While immaterial contradictions do not affect the credibility of witnesses, if you find from the proof that there have been material contradictions made by any witness in this case and this material contradiction was intentional and that it was not in good faith, that would go to the credibility of the witness, and it is the duty of the jury under those circumstances to weigh the testimony of that witness who has given a material contradictory statement, if such appears from the proof in the case, and to say whether or not it was an honest mistake or whether or not it was intentional and proceeded from some bad motive, and that question is one for your consideration and yours alone. I can only give you the general rules of law applicable to cases of this character and leave

it for you to determine the result and what effect it may have upon your weighing the testimony of the witnesses in this case.''

The only criticism the defendant can make of this charge is that it fails to tell the jury that if the witness has wilfully and knowingly sworn an untruth material to the issue, that the jury may disregard his testimony entirely. The court tells the jury they are to judge in the event supposed, what weight to give to the testimony, but does not say they may disregard it altogether. Considering the explanation given by the plaintiff and all the testimony bearing on this point, we do not think it probable that the jury ever reached the conclusion that plaintiff wilfully and knowingly testified falsely and therefore the omission complained of could not harm the defendant's case.

In regard to the eighth assignment, the whole contention of defendant, after quoting the charge, is set out as follows:

''The error herein committed is that the court did not properly charge the jury with reference to the burden of proof on the issue of contributory negligence, where the plaintiff's own proof shows that he is guilty of such negligence. The court had charged the jury that the burden was on the defendant, and totally failed in any place to charge the jury that the burden was not on the defendant, if the plaintiff's own proof showed that he was guilty of contributory negligence which proximately caused the accident.''

The charge of the court is correct and the assignment is not. The burden of proving contributory negligence is upon the defendant and this burden does not shift. Stewart v. Nashville, 96 Tenn., 50.

This burden of proof may be made out from plaintiff's own evidence or otherwise. If plaintiff's proof makes out a case of contributory negligence, the defendant may be relieved of the necessity of introducing any proof in order to carry the burden, but this does not at all change the rule that the burden of proof is upon the defendant.

The ninth assignment is that the verdict even after being reduced from $7000 to $6000 is so excessive as to show passion, prejudice and caprice. The court is asked in this connection to consider the affidavit of Dr. Speed. This cannot be done. The only purpose of this affidavit was to obtain a new trial on the ground of newly discovered evidence. It cannot be considered as evidence in the case. Besides, Dr. Speed saw plaintiff for the last time six months before the trial and estimated his disability at fifteen per cent. Dr. Clifton says he had grown worse down to the trial.

The truck being crushed between the street car and the subway post, plaintiff was cut and bruised, became unconscious and had to be pulled out of the wreckage. Eighteen stitches were required in

his head and three in his arm. His left knee was lacerated and his right knee bruised. He had been crippled in childhood in his right leg and it was one and a quarter inches shorter than his left leg. In this accident the principal injury was to his left leg. He stayed in bed about two weeks, then tried to go back to work, paying a negro boy to help him on his route, then employed a white boy for about six weeks. After this he tried to work by himself for about a week and had to give it up on account of his injuries. During this time he says he suffered great pain and could sleep only under the influence of an opiate. A knot formed on his left leg just below the knee and continued to grow until at the time of the trial it was the size of an egg. The use of his left leg is impaired. He cannot walk on it but a short distance and if he straightens it out he cannot stand on it. Dr. Clifton says the knot on left leg continues to grow and can be removed only by an operation and that he has advised against an operation for fear a cancer would develop. The condition of the left leg is due to the accident.

Plaintiff worked for the street car company for a number of years at $180 per month. When working for the milk company he received about $125 per month. After a period of total disability he was given employment by his brother-in-law at $20 per week. This is light work and the proof suggests that the employment is due somewhat to the favor of his brother-in-law, to help plaintiff support his family. Plaintiff was thirty-seven years of age when injured. With these facts in the record and the verdict approved to the extent of $6000 by the judge, this court does not feel warranted in disturbing the amount of the judgment. It results that all assignments of error are overruled and the judgment of the lower court is affirmed. Defendant and surety on appeal bond will pay the costs of appeal.

Owen and Senter, JJ., concur.